**Ralph E. JOHNSON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 4:05–CV–72 RWP–TJS.**

United States District Court, S.D. Iowa, Central Division.

Nov. 7, 2005.

Having reviewed the subpoena the Court disagrees with the characterization. *See* November 18 Report at 26 n. 7.

**1124**

Thomas A Krause, West Des Moines, IA, Jean M. Mauss, Max Schott & Associates, PC, Des Moines, IA, Lead Attorney, for Ralph E. Johnson.

Maureen McGuire, U S Attorney's Office, Des Moines, IA, for Commissioner of Social Security.

## ORDER

PRATT, District Judge.

Plaintiff, Ralph E. Johnson, filed a Complaint in this Court on February 8, 2005, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for Social Security Disability benefits on November 8, 2001, claiming to be disabled since February 1, 2001. Tr. at 86–88 & 218–20. Plaintiff, whose date of birth is July 23, 1956 (Tr. at 86), was 47 years old at the time of the hearing. Tr. at 32. Plaintiff is last insured to receive disability benefits on December 31, 2005. Tr. at 89. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Stanley Hogg (ALJ) on June 16, 2004. Tr. at 28–66. The ALJ issued a Notice Of Decision—Unfavorable on July, 12, 2004. Tr. at 8–22. After the decision was affirmed by the Appeals Council on December 4, 2004, (Tr. at 4–6), Plaintiff filed a Complaint in this Court on February 8, 2005.

Following the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. At the second step the ALJ found that Plaintiff's severe impairments are chronic neck and back pain, status post cervical and lumbar fusion; loss of vision in the left eye; type II diabetes with good control; obesity; chronic obstructive pulmonary disease; obstructive sleep apnea; and, a history of hypertension. The ALJ found that none of these impairments qualify for benefits at the third step of the sequential evaluation. At the fourth step, the ALJ found that Plaintiff has the residual functional capacity for sedentary work. Tr. at 20. The ALJ found that the ability to do sedentary work was reduced by Plaintiff's need to avoid occupations which require good depth perception and that he needed to avoid exposure to fumes and hazards. The ALJ found that Plaintiff is unable to perform any of his past relevant work. At the fifth step of the sequential evaluation, the ALJ found that there are a significant number of jobs in the national economy which Plaintiff can perform. In making the fifth step finding, the ALJ relied on Medical–Vocational Rules 201.21 and 201.22. Tr. at 21.

### MEDICAL EVIDENCE

Plaintiff was seen at the Marshalltown McFarland Clinic April 9, 2001, after an absence since May of 2000. Diagnoses were type II diabetes with good control with diet; obesity; COPD; tobacco abuse; insomnia; status post cervical fusion; sta-

tus post lumbar fusion with hepatitis C positive bone graft; and, status post T & A. In spite of the diagnosis of COPD, Plaintiff continued to smoke, although he said it was under a pack a day. He was encouraged to stop smoking altogether. Tr. at 160. On June 12, 2001, Plaintiff complained of trouble breathing. He was still smoking about a pack of cigarettes per day. It was noted that Plaintiff was working. After treatment with a nebulizer, examination of Plaintiff's lungs revealed improved air flow. Tr. at 158. On June 18, 2001, Plaintiff requested an excuse to return to work. Tr. at 157.

Plaintiff was seen for a disability examination by Allan E. Peterson, M.D. on April 15, 2002. Plaintiff claimed to be disabled due to lower back and breathing problems. Plaintiff reported an injury in 1987 which subsequently required surgery on his cervical spine. Plaintiff had surgery on his low back in 1990. After the second surgery, Plaintiff received a degree in drafting and worked in that field until two years before the examination. He stopped working as a drafter because of low back pain. Plaintiff said that he does not see out of his left eye due to an injury received in a bar fight in the 1970s. The report states both that Plaintiff was smoking a pack of cigarettes per day, and in the next sentence that he currently does not smoke. On physical examination, Plaintiff was noted to be 72 inches tall with a weight of 293. Mild to limited range of motion was noted in his cervical spine. Tr. at 166. Plaintiff was noted to have some expiratory wheezing. Plaintiff told the doctor that he could lift a maximum of 10 pounds and carry it only about 10 feet. He said that he could stand for about 30 minutes and sit for an hour. Plaintiff said that he can only walk about a block because of his lungs. He said that he cannot stoop, climb, kneel, or crawl because of his low back pain. The doctor wrote that Plaintiff was using over the counter inhalers and that he was trying to quit smoking. Tr. at 167.

Pulmonary function studies dated June 12, 2002, showed mild obstructive lung defect. Tr. at 172–73A.

Plaintiff was seen at the University of Iowa Hospitals and Clinics on January 16, 2003, for initiation of primary care. Tr. at 193–95. Although Plaintiff reported feeling generally well, his main complaint was worsening dyspenea on exertion. Plaintiff said that he was smoking about a half pack per day. Plaintiff said that the woman with whom he lives also smokes. Tr. at 193. After a physical examination, five diagnoses were made: Dyspnea on exertion, with notation that Plaintiff was strongly advised to stop smoking; a questionable mass seen on a chest x-ray, with notation that Plaintiff was at high risk for lung cancer; high blood pressure; microscopic hematuria; chronic back and neck pain controlled with Tylenol, with notation of advise for exercise. Tr. at 194.

On February 13, 2003, Gwen Beck, M.D. from the University, wrote to Plaintiff to advise him that a CT scan of his chest done on January 13, 2003, did not show any abnormal masses. Tr. at 192.

Plaintiff saw Dr. Beck on February 24, 2003. The doctor noted that pulmonary function tests were of poor quality and suggested a mixture of mild obstructive disease in addition to some restrictive disease secondary to obesity. Tr. at 190. Plaintiff reported migraine headaches for which he was not receiving treatment. The doctor prescribed medication for the headaches. Tr. at 191.

When Plaintiff saw Dr. Beck on April 21, 2003, he was given a prescription of Midrin to take at the onset of headaches. Depressive symptoms were diagnosed and Plaintiff was given a prescription of Paxil. Tr. at 187. On April 25, 2003, Plaintiff was seen by Bernard Fallon, M.D. because of

microscopic hematuria, however no cells were found on microscopic examination. Tr. at 185.

Plaintiff was seen at the Sleep Disorder Center at the University of Iowa on July 24–25, 2003 for an overnight polysonogram which showed significant obstructive sleep apnea. In a letter dated December 21, 2003, addressed to Dr. Beck, Shekar Raman, M.D. wrote that the CPAP machine and elevation of the head had resolved the snoring and all major obstructions. Dr. Raman said that Plaintiff reported better sleep than usual during the sleep study. Tr. at 216.

On August 27, 2003, Plaintiff saw Bruce E. Johnson, M.D. at the University for his chronic thoracic and upper lumbar pain. Tr. at 196. On physical examination, there was spinal limitation of the lower back. There was tenderness to palpation over the area L1 to L2, and approximately T10. Tr. at 197. Dr. Johnson's impression was that Plaintiff's condition was consistent with "mechanical OA (osteoarthritis) versus a muscle strain." The doctor prescribed Ibuprofen 800. Tr. at 198. Plaintiff had also complained of chest pain, but the doctor found no clear cardiac etiology. The doctor said that Plaintiff would be encouraged to stop smoking. Tr. at 199.

Plaintiff was seen at the University on January 14, 2004 for followup of his medical care. Christophe Goerdt, M.D., wrote that since the last visit, Plaintiff had undergone a sleep study which showed significant sleep apnea for which he was in the process of obtaining a CPAP machine. Tr. at 201. On physical examination, Plaintiff's lungs were noted to be clear. The doctor stated that Plaintiff's back pain was most consistent with chronic degenerative disease, possibly related to his previous injuries and surgeries. Tr. at 202.

Plaintiff saw Dr. Beck on March 8, 2004. Plaintiff complained of a band of numbness over the right elbow area, without elbow pain, and pain over the right 3rd and 4th knuckles as well as shooting pain down his right 3rd and 4th fingers. He said the pain occurred mostly when typing and was relieved when he stops working with his hands. Plaintiff was still smoking 10 to 15 cigarettes per day. Plaintiff reported no chest pain but he had limited exercise tolerance with shortness of breath on exertion. Tr. at 203. Plaintiff was given a wrist support for the pain in his fingers. He was told to continue taking Ibuprofen for his back pain. Again, Plaintiff was strongly advised to stop smoking and was prescribed nicotine patches. Tr. at 204.

On March 8, 2004, Plaintiff also saw Joseph J. Chen, M.D. for consideration of back exercises. In addition to back pain, Plaintiff described right posterior thigh pain and diffuse right arm pain. It was noted that Plaintiff had not followed through with exercises that had been prescribed in the past. Plaintiff was instructed on low level abdominal stabilization activities. Tr. at 206.

Plaintiff was seen by Dr. Beck on April 26, 2004 for routine medical follow up. Plaintiff reported that his house had burned and, as a result, needed a new brace for his back. Plaintiff described his pain as nonradiating, worse with bending, getting up and sitting down. Plaintiff denied any numbness or tingling in his legs. Ibuprofen and Tylenol improved the pain, but not to a satisfactory level. Plaintiff also described migraine headaches which occurred once a week and which last from a few hours to four days. Plaintiff said that his depression had worsened because of the loss of his house. Tr. at 208. After an examination and review of Plaintiff's history, Dr. Beck noted that there was no evidence of neurologic involvement in Plaintiff's back pain. Nortriptyline was added to help control the pain. Plaintiff was given a prescription for Imitrex nasal spray for his headaches. The COPD was

noted to be well controlled and stable. Tr. at 210.

## ADMINISTRATIVE HEARING

The Court has read the testimony of Plaintiff at the hearing at of June 16, 2005. No purpose would be served by summarizing the testimony here. The significant point of the hearing was that the ALJ did not call a vocational expert to testify.

## DISCUSSION

 The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

 In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

 In his brief, Clerk's 9, Plaintiff prayed for a remand based on his argument that the ALJ made erroneous credibility findings. The Commissioner took issue with that argument in document 11. As the Court wrote in *Anderson v. Barnhart,* 344 F.3d 809, 814 (8th Cir.2003): "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." The ALJ's failure to call a vocational expert, however, requires a remand.

 It is well settled law in the Eighth Circuit that in cases in which a claimant suffers from nonexertional impairments, the Medical Vocational Guidelines cannot be used to direct a finding of not disabled. In such circumstances, the ALJ must call a vocational expert to testify in response to a hypothetical question which includes all of the claimant's impairments and limitations that are supported by the record. *McCoy v. Schweiker,* 683 F.2d 1138 (8th Cir. 1982)(en banc). In *Draper v. Barnhart,* 425 F.3d 1127, 1132 (8th Cir.2005), the Court wrote that the Eighth Circuit cases have often explained that "... if the claimant suffers from nonexertional impairments that limit [the] ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to utilize testimony of a vocational expert."

In the case sub judice, the claimant suffers from pain, breathing problems, depression, and obesity, all of which are nonexertional impairments. *McCoy,* 683 F.2d at 1148. The ALJ found that Plaintiff's residual functional capacity for sedentary work is reduced by the need to avoid occupations which require good depth perception and the need to avoid exposure to fumes and hazards. Testimony of a vocational expert, therefore, is required.

 In addition to a failure to call a vocational expert, the Court would note

the lack of medical evidence to support a residual functional capacity finding. Although an ALJ must assess the claimant's residual functional capacity based on all the evidence in the record, it is a medical question and must be supported by some medical evidence. In *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir.2003), the Court wrote:

> When determining a claimant's RFC, the ALJ's determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir.2002). RFC is a medical question defined wholly in terms of the claimant's ability to perform exertional tasks or, in other words, "what the claimant can still do" despite his or her physical or mental limitations. *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th. Cir.1987); 20 C.F.R. § 404.1520(e) (1986). Under this [the fourth step] the ALJ is required to set forth specifically a claimants limitations and to determine how those limitations affect her RFC. *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir.1997).

Furthermore, although the ALJ has a duty to fully and fairly develop the record, even when a claimant is represented by an attorney (*Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir.2002)), the burden to prove residual functional capacity remains on the claimant even after the burden of production shifts to the Commissioner at step five. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir.2004). Continuing, the Court wrote:

> Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in the case. *Snead v. Barnhart*, 360 F.3d

834, 838 (8th Cir.2004). The ALJ must neutrally develop the facts. *Id.* He does not, however, have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. *Id.* at 839.

In other words, as the Court said in *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir.1994): "The goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice."

It is imperative that ALJs and attorneys work together to insure the decision reached is based on a fully and fairly developed record.

## CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The final decision of the Commissioner is reversed and the case is remanded for further proceedings consistent with this decision.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).[1] *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916(S.D.Iowa 2005).

IT IS SO ORDERED.

---

**1.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."